We will hear argument next in number 2009-3268 Reardon against the Department of Homeland services. Begin when you're ready. May it please the court, Adam Carter of the Employment Law Group, on behalf of the petitioner Kevin Reardon, who's with us here today in court, and my colleague Scott Oswald, who's sitting at council table. The administrative judge made three errors that deserve reversal. First, she confused the requirement that an employee prove the MSPB's jurisdiction by making non-frivolous allegations with the sufficiency and reasonableness of those allegations. Second, she also made factual determinations of what she thought was reasonable before Captain Reardon had any chance of discovery or a hearing. And third, she did not view his pleadings with the lenient standard appropriate for a pro se appellant before the MSPB. So let's take the first. Well, the problem I'm having is, let's take what seems to me potentially the most serious allegation, which is interference with the evaluation process by a political appointee. Where does the statute or the regulation or manual forbid that? There are provisions that bar political influence, but I don't see anything that prohibits a superior from affecting the evaluation process at the inception. I'm glad Your Honor asked that, because what it is is it's embedded in the merit system principles that are at 5 U.S.C. 2301. And if you go specifically to B.8, employees should be, and this is A, protected against arbitrary action, personal favoritism, or coercion for partisan political purposes. The administrative judge just concluded, without citing any authority, that Mr. Jameson was free to get these kinds of reports. And he wasn't. He would have no purpose. He's not a raider for any of these people. Let me ask you this. I'm not sure he has no purpose. Suppose that I'm a second levels supervisor, and I've just come into the job, and I want to get a sense of who some of the stronger performers are, who are some of the more problematic performers, and who are, frankly, the serious non-performers in a large group. And so I call in my second level, first level supervisors, and I say, give me a description of each of these people, how they're doing, what are their strengths, what are their weaknesses. There wouldn't be anything wrong with that, would there? Well, if you're not a raider, and if you have no basis for, you're not going to be performing any of these ratings, and by the way, this is... No, I'm not a raider, but I'm a supervisor, and I want to know who the strong members of my team are. And that's fine, once those ratings all come out. No, no, no, I mean, I want to do this, I'm not even, it's not part of the rating cycle. I've come in, ratings occur in the spring. I'm coming in in October, and I want to get a sense right off the bat who I can rely on and who I have a problem with. I can see that as a supervisor, you're entitled to see employee files and so forth. No, I want to know right now, prospectively, how these people are, who's good? Can I not do that? Within the cycle, understand the timing of this. This is right at the, September 30th is the cutoff date. This is October 3rd, so this is right after... Yeah, I guess that's right, it's October. So this... I'm, well, give me my hypothetical now. Okay, your hypothetical, if this is April... I'm in spring. If this is April, then yeah, there's no problem with getting the files and reviewing what was last October's reviews. Well, I'm not reviewing past... I want to talk to my second-level supervisors about these people. I want just a discussion of how they've been doing, has their performance continued, have they improved, have they fallen off since the last rating period. Well, I... I look at the files, and I say, you know, I see that this fellow needs work. Has he improved in his work? I suspect that those kinds of discussions happen all the time and are appropriate within the cycle. What we're getting at here, though, is the formal evaluations that come out on September 30, and the political appointee, right on the eve of an election, reaching down into the system and having an effect on people that he has no business rating. How on earth do we know whether he's having an effect or not? Having an effect requires that he do something with them. The only thing he did... I mean, presumably, one alternative is he would look at them and read them. That doesn't satisfy the effect test. The point here is that there is no purpose for Mr. Jameson to get all of these reviews before they've been finalized and get them before they've been finalized, except to influence them in some way. Which is what? And this goes back to your question, what was the exact statute? It's 2301B8A, and that is incorporated into what Mr. Reardon actually complained about, because that's 2302B12, if I'm not mistaken. What you have here, if you look at 12064, Bond says, providing this information in advance inadvertently leaves the impression that he may be attempting to influence the way in which the subordinate raters or reviewers conduct their annual employee performance evaluations. So exactly what provision says that a supervisor can't influence the rating evaluations? I'm sorry, Your Honor, where were you reading from? It's the bottom of 12064. This is from the Bond email. That's right. And Bond says, providing this information in advance leaves the impression, etc., etc. And that's your contention, is that that was what was going on here, that he was attempting to influence the ratings by the subordinates, right? And if I might, I believe that if the factual record were able to be developed, he had directed that ratings could not be finalized until he reviewed and approved them. And that's the obvious interference. It was his direction. Where is that in the record? I have that, as I say. I believe that would be the factual. Okay, but he didn't provide, there's no affidavit or declaration or email that says that, right? I don't believe so. Okay, but we have to go with what we have here. Well, and again. But even assuming that a superior is trying to influence the ratings, what exactly, what provision says that that's impermissible? Again, it's 2301B8A. Where is that quoted? 2301B8A. Is it quoted in your brief? I'm not certain about that, Your Honor. It's 5 U.S.C. 2301B8A that employees should be protected against arbitrary action, personal favoritism, or coercion for partisan political purposes. That's the one I think is the closest to embodying the merit that a political appointee ought not to inject themselves into this. The second problem. Suppose, if you could return to my hypothetical again. Suppose that the employee, upon hearing that all of the supervisors had been called in to get an assessment, had decided that this really was a predicate to the supervisor exercising some political determinations as to individual employees and so forth, and complained on that ground. Would that be a protected disclosure in your view? I think so. And it would be a protected disclosure because asking the supervisors to give their informal assessments of the strengths and weaknesses of various employees would have the potential of creating an arbitrary or politically skewed decisions by the supervisor? Would that be the theory? I think the theory is that it's a violation of the very carefully regulated procedure for performance evaluations that this political appointee is injecting themselves into and that that would be inappropriate. It certainly is protected if the employee reasonably believes this is a violation of law to then be protected against retaliation, for example, for that. But the key word is reasonably. The employee can't just say, I think that this is a violation of law with no real basis. I agree with that. It has to be a violation of law, for sure, and reasonably believed to be a violation of law. Incidentally, I was a little confused by the administrative judge's discussion of gross mismanagement and so forth. Of course, there is no de minimis application to a violation of law. You either violated the law or you didn't. The other difficulty I'm having with that particular disclosure is that the disclosure itself, at least I think that you covered in your OSC submission, was to Mr. Stephan, a person who had already seen the information. He was on the original email, was he not? Yes. If that's the disclosure, the Jameson request for all of this material, how can you have a protected disclosure that's already known and in the possession of the person to whom you're disclosing it? I think the disclosure is that this is a violation, this is wrong, this is illegal, and that's the stepping up. The whole Whistleblower Protection Act is designed to protect people who step up, who go out of their way to point out wrongdoing. Here, he's saying to Mr. Stephan, someone who's in a position to fix it, saying, this is wrong, he shouldn't do this. Wait, wait, wait. Your definition of disclosure, let's say somebody reports to the Washington Post that there's a leak at some facility. That's your classic whistleblower. And the disclosure is, God, this is a problem, there's a leak in this facility. And let's assume it was all over the airwaves, a million airwaves, that this facility is leaking, with the fact that he added to that saying, there's a problem with this. Make that a protected disclosure? I guess I'm not seeing how his comment, which is, I think this is a problem, turns what is otherwise not a disclosure at all because it's already known. You're not disclosing anything when it's already known into a protected disclosure. I think the disclosure is the combination of looking at what has been sent to an email group and then being the guy who says, hey, this is wrong. And steps up and says to someone in a position of authority, a supervisor, to say, this is wrong, this is illegal, that's the disclosure. And it's illegal because it's a violation of the merit system principles and so forth. That's the disclosure. Do you have any cases that are close to that in terms of parsing out the difference between the disclosure of the actual fact and what happened versus the commentary that it's problematic? If I do, I'll find it, for your honor, by the time I'm back up on my feet. I don't readily. Let me just, before my time runs out, address the other two points that I believe merit reversal. And that is the administrative judge's requirement that Mr. Reardon come forward with evidence. And I want to point out that there's a way to submit your forms by clicking a little box that say that you submit them under oath. And Mr. Reardon did that every time. He submitted everything under oath with clicking that box. And by doing so, his submissions are as if they were, in the old way, verified complaints or as if they were affidavits. And to the extent that the administrative judge did not credit his pleadings as being verified, I wanted to point that out. And then secondly, I wanted to just, or third rather, is the leniency. Where does the pleading say that this was done in an attempt to influence the evaluations? The, what the pleading does is it says that it refers to 2302. And that incorporates, B-12 incorporates 2301. I'm not talking right now about whether it's legal or illegal. I'm saying that does any of the submissions say this, we have evidence that this was done in order to influence the evaluations? No. But he does say that there could be no, there was no legitimate purpose for them but that. Okay. I'm a little confused by the time if that's my original time or my 15th. You actually know, you've run through your rebuttal, but we'll give you a couple of minutes of rebuttal. Thank you, Your Honor. I appreciate it. Mr. Solomonson. Good morning, Your Honor. May it please the court. This court should affirm the MSPB's dismissal. Suppose a political appointee during the evaluation process says to a subordinate, I want you to rate this person in such and such a way. Is that illegal? For political reasons? No, just without regard to what reasons, personal animus, you know, his own view of the performance of the person or whatever it is. He says, I want you to rate this person this way. I spent some time looking at that exact question, Your Honor, and the closest that I came up with to an answer is in this court's decision in a case called Doyle issued in 2008 where this court said there is nothing arbitrary or capricious about the chief of staff of a medical center, VA medical center, reviewing and commenting upon the quality of performance evaluations written by his subordinate supervisors. But that's sort of looking at the evaluations after they're prepared. That's not what we're talking about here. But it does suggest that there's certainly nothing wrong with the supervisor saying there's something wrong with the evaluation, in my view, that you, my subordinate, need to fix in the evaluation. Whether the supervisor could reach down and actually wholesale change the tenor of the evaluation, I don't know. I have not seen any regulation that prohibits that. There's a problem, though, if it's done beforehand, isn't there? I mean, as I vaguely recall, I mean, there are all of these steps you have to go through in terms of finalizing the performance assessment, including input from the employee and all of this stuff. And if somebody reaches out from up on high and says this is going to be the end game, it sort of undoes what is contemplated by having all of these procedural steps. Does it not? Even if that were the case, Your Honor, though, the crucial flaw with Dr. Reardon's case here is that there's no indication in the e-mail that Judge Dyke pointed to that's at the joint appendix at 12064 that indicates that Mr. Jameson was seeking the information in order to interfere. That is pure speculation. Well, the other side said there's no legitimate basis. So what do you think is the legitimate basis upon which he could have done it if he wasn't going to interfere, if he wasn't going to insert himself into the process? He just wanted to know what's going on? The budgetary process, for one. I can see in my own organization, Superior, saying we want to know for hiring purpose how many people are going to be 15s, 14s, 13s. We need to know how much bonus money we should set aside for what the expected bonus payouts are going to be like. There's all sorts of innocuous reasons. And, in fact, the e-mail also indicates that they were planning when providing the e-mail, that they were going to scrub the names out. So it was just going to be aggregate data. What we're talking about here is whether he gets a hearing, whether he's brought in enough to get a hearing, rather than have him dismissed on the pleadings. And he has brought in an e-mail from somebody that suggests that it creates the appearance of doing this. If, in fact, we assume that it would be illegal to do it, why isn't that enough to get him a hearing on the question of whether that's what was going on? I mean, after all, he doesn't even get discovery until he gets past the jurisdictional threshold, right? That's correct. And the issue is whether any reasonable person could take a look at this e-mail at 12064 and assume that there's necessarily something that's wrong with it. Well, I'm not sure that's the standard. I mean, why is the standard that somebody could take a look at this e-mail and say there's reason to be concerned and to think that there might be a problem here that should lead us to have discovery and a hearing? Because here the concern that Dr. Reardon alleges best jurisdiction in the MSPB is the allegation that Mr. Jameson was trying to improperly interfere on a political appointee level with a merit system decision. And the problem is that the e-mail has nothing about Mr. Jameson interfering. And so that is an inference that is unreasonable, unwarranted. It is not an inference that – and that is exactly what the AJ found at the joint appendix at 9, that Dr. Reardon, quote, never explained how he arrived at his general conclusion that Mr. Jameson intended to influence or manipulate the ratings process. Well, what about the e-mail on page 1264 which says – Yes, but the test is an objective test, and this court has held before, that we don't look to see whether there are other people that agreed or disagreed with your concern. But the question is what he was doing. You not only have that e-mail, the Bond e-mail, you also have the Stephen e-mail, which says this approach seems to allow very senior ranking officials within the organization to have input that they would normally not have regarding fairly low-ranking ratees. So you have two people who seem to think that this might be done in order to influence the ratings. And if you agree that interfering with the ratings in advance would be a violation of law, then maybe there's enough evidence at least to get discovery in a hearing here. That just, Your Honor, just begs the question whether the original e-mail from Mr. Bond, which states – Let me ask you directly so we're clear about this. Would it violate the law for a superior, a political superior, to intervene in the rating process, I want this person rated this way before the ratings have come out? Would that be proper or improper?  Assuming that the rating is not arbitrary and capricious in and of itself. I don't know. I have not seen anything that makes it unlawful. Even if the official is saying, I don't care what the employee has to say in his defense, I don't care what any of the supervisors may say from their own – who have the rating authority and have greater knowledge presumably about the employee. I want this employee rated unsatisfactory, period. And if you don't do it, you're in big trouble, Mr. Rader. That wouldn't be a violation of at least the spirit of the rating system? I must say, Your Honor, that would sound like a violation of the spirit of the rating system. All I'm saying is that I've looked long and hard to find whether a superior two steps up can actually dictate the rating subordinate of a two levels down subordinate. And the most I could find was this court's decision in Doyle saying that – Well, but there is a process that is defined as the appropriate process. This would be, at minimum, a variance from the appropriate designated process. So whether you call it a violation of law because there's some independent legal prohibition against that or whether you simply call it a deviation from prescribed procedure, in both cases it would seem to me that if that – to take Judge Dyke's example, that would seem to me to be an irregularity, i.e. not complying with the legal requirements of the rating system. Right? It seems that way. In several parts of Your Honor's question, some parts suggested more that it would be a violation of the spirit of the regulation. Well, let's just say if the regulation says before the rating the employee gets to have his say and then a Mr. Jameson says, I don't care what he says, he's going to get an unsatisfactory, whether you call it the spirit or the terms of the rating system, it seems to me that's a violation. Right? If we posit that there is such a regulation, then yes, that would violate the regulation. Is it not a regulation that sets forth the procedures for ratings? I have not seen any. There's none been suggested by – Well, how do people know what to do? There must be a regulation or a manual or something. Or a manual of some sort. I assume – There's a procedure which is – I assume there is a procedure. Yes, Your Honor. Trust me, I've done these things. And I assume there is a procedure, but what I'm saying is that I'm not sure at what point the dictation bias to level up superior starts to – would violate that procedure. Well, where do we find the procedure? Well, it is not in the record, Your Honor, but petitioner has not suggested that there's been a violation of any such procedure merely by asking for the information. The whole case – We were just discussing whether or not we were assuming that he was going to influence it or that someone would have a reasonable belief that he was going to influence the ratings. And as I understood what the judge, the administrative judge said in this case, is that she might have well agreed, but what she couldn't do is make the leap from the request to the speculation, as she termed it, that he was going to influence the ratings. So I'm not clear that if he had said, I'm asking for these draft proposals because I plan to take a look at them, get my input in and influence these. I'm not sure the A.J. wouldn't have come out differently here. I thought she was just hanging her hat on the back that there's no evidence that that was the purpose of the request. I believe that's correct. And so it's predicated on the fact that no reasonable person would have necessarily assumed that the request was for the purpose of influencing or manipulating the ratings. Is that the way you understood what happened here? Yes, Your Honor. So the question I'm back to, I guess, is whether or not those emails, at least we have a few people that knew about that or were alerted, and it appears as if Mr. Reardon was not alone in at least thinking there's a possibility that that is at least one of the purposes of the request. But again, Your Honor, under this court's decision in La Chance, a purely subjective perspective of an employee is insufficient, even if it's shared by other employees. I thought the answer— Go ahead. We're not talking about it. This isn't the end of the case. The question is whether he gets discovery in a hearing, whether he's more than enough with these emails to raise a question about it so that the MSPB should allow it to go through the procedure to develop the record to see whether there's anything to this or there isn't anything to it. But no reasonable person, Your Honor, could take a look at the email by Mr. Bond at 12064 and conclude that Mr. Jameson was trying to influence the process. It is not a reasonable conclusion. He's simply requesting data. I thought your— I apologize. The actual email request from Mr. Jameson is at 12065 and 12066. I would have thought your response on the emails on 12064 would be that because this concern had been raised, they wanted to avoid any possible inference that there would be a misuse and therefore they said let's just back off and not do this because that somebody might draw the wrong inference. That doesn't make the request unlawful. That's also the case as well, Your Honor. The fact that someone goes and asks an agency counsel, someone has a concern, can we just vet this process by you and make sure it's okay, that doesn't post facto mean that the original concern was a reasonable one. It just means that people are going to dot their I's and cross their T's like agency folks do every day. And if a simple email request to do that were to retroactively make an earlier concern, a whistleblower disclosure, there would be an awful lot of people who are blowing the whistle every day in government work. That cannot be the way that this email is read. That is correct. What about the point I raised with opposing counsel about whether his disclosure being at least what he alleged to the OSC as being exclusively his disclosure of that information to Mr. Stephan, who is already in possession of that information? That is correct, Your Honor. In fact, there are 19 people on that original request from Mr. Jamieson, and the disclosure by Dr. Reardon was only to Mr. Stephan. This court has held in a number of cases that when we talk about a disclosure, we're talking about a disclosure of conduct, not a disclosure of legality. We agree with Your Honor that here there's no disclosure also because Mr. Stephan was already aware of Mr. Jamieson's request. It was broadcast to 19 different subordinates. What case says that? I'm sorry, Your Honor? What case says that the disclosure of the facts falls within the already known exception when the employee couples the facts with a statement that it's wrongful? A case called Coppins, Your Honor, which is an unpublished case, but it's also Coppins itself relies on Huffman and Movison, I think it's pronounced, and there's another case called Almaraz that postdates Coppins as well. And they say? And they say disclosure means to bring into view by uncovering and relates to the underlying conduct rather than to the asserted fact of its unlawfulness in order for the disclosure to be protected by the WPA. That's Coppins? That is Coppins, Your Honor. What's the cite to that? That's 117 Fed Appendix 110. Okay. But the cases it cites don't say that, right? Huffman doesn't say that. Huffman, in a footnote, Your Honor, in DICTA, the published case, yes, Your Honor, at footnote 2. What does it say? I'm sorry, Your Honor? What does Huffman say? It says it is clear from the statute that the disclosure must pertain to the asserted fact of its unlawfulness or impropriety in order for the disclosure to be protected by the WPA. So for that reason as well, we agree that there's no disclosure here to Mr. Stephan of the alleged impropriety. Something else to note, too, is that I'm not sure that because the disclosure that we're No, I take that back. No, you're correct. You think then that if a, let's just say Mr. Jamison happens to mention to a group of people, including Mr. Stephan, he says, for that matter, Mr. Stephan mentions in the presence of Mr. Jamison and Mr. Stephan says, I'm going to fly to Tampa for a conference, and I found a cheaper flight, so I get to put the rest of the money in my pocket. And Mr. Jamison, well, good job on finding the cheaper flight. And suddenly then Mr. Reardon says, whoa, you know, you can't do that. That's contrary to all the federal rules on voucher fraud. And then he gets fired because he spoke up. That wouldn't be within the scope of the Whistleblower Protection Act? I don't believe so because in that hypothetical, Dr. Reardon is actually making the disclosure to the wrongdoer himself. No, no. I'm sorry. I changed the facts on you. I had Dr. Reardon then, even though Mr. Jamison, the supervisor, had already had knowledge that Mr. Stephan was traveling and then pocketing the excess money, Mr. Reardon said, I know you know that this is happening, but let me tell you that this is a gross violation of the voucher rules. And Mr. Jamison's response is, thank you very much for telling me you're fired. Yes. In fact, I believe you're on. That'd be OK. I believe, Your Honor, under the cases that I was citing before, one of them actually dealt with a travel policy that someone alleged to be unlawful. And the court found that because the travel policy was well-known and the people to whom he disclosed it who were aware of the travel policy, it couldn't be a protected disclosure. Is that Coppins? That may be Coppins, Your Honor. Well, you might want to head. Oh, I'm sorry. I was just going to say, in terms of Huffman, if I recall the Huffman footnote, what it's saying is you don't have to disclose. And the disclosure doesn't have to say it's wrongful as long as the facts lead to a conclusion of illegality. But I don't recall that Huffman was saying that adding the allegation of wrongfulness doesn't add something to the facts. Do you understand the difference? Your Honor, I see what Your Honor is saying. But I would just note that prior to the quote I read from Huffman, the court says there may be situations where a government employee reports to the wrongdoer that the conduct is unlawful or improper. And the wrongdoer, though aware of the conduct, was unaware that it was unlawful or improper. And then the quote begins, nevertheless, or nonetheless, the report would not be a protected disclosure because the disclosure must pertain to the underlying conduct and not the illegality. Well, OK. I think the— You might want to consider amending your answer to Judge Bryson. He asked you, is that OK? And you said, yeah. I mean, I think perhaps the answer is that may not be OK. If this person appeals his discharge, it may—clearly, the purpose of the discharge was because he pointed out something was unlawful. I don't know that that would be OK and that would withstand scrutiny on an appeal of the discharge to promote the efficiency of the service. But I think your answer was— If he were a probationary employee, just to take 7513 out of the picture. I understand. And what I thought Judge Bryson was asking was whether that was a protected disclosure under the WPA. Right. OK. And— And you say no. And I say, I don't think so based on these cases that I'm reading. But obviously, sometimes these are highly fact-specific and perhaps— I understand. Very well. Thank you, Your Honor. Thank you. We'll hear rebuttal. We'll give you three minutes of rebuttal if you need. I'll just take a brief moment, Your Honor. As I think this colloquy has pointed out with Judge Prost, I don't think that the disclosure has to be like an original source like under the False Claims Act. It can be—under Huffman, you can't come in and be a me too. But you certainly can be the first one to point out the implications of the wrongdoing as being illegal and be covered. The Doyle case, I confess I haven't read recently, but a chief of staff of a medical institution doesn't strike me as a political appointee. That's a distinction there as well. One thing that we have not talked about is the disclosure to Mr. Jameson about what Mr. Steffen was doing. And then Mr. Steffen, when being confronted with that and knowing about it, was so very angry at Mr. Reardon. That also is a protected disclosure before too. And our argument there is—not to reiterate what's in the briefs, but just quickly—that I don't believe that the administrative judge took account of the fact that Mr. Reardon was still in a probationary status and was still competing for the job and that Mr. Steffen—what Mr. Steffen was doing by axing out his responsibilities was interference with his getting the job appropriately. And so that would be another—he went clearly above Steffen's head. We're getting beyond the scope of fair rebuttal, I think, on that point. I just didn't want to leave it out. That's fine. Let me ask you a question about what would happen—suppose there's a hearing in this case. And I want to see how this would play out in your view. And suppose that Mr. Jameson comes in and says, well, the reason I asked for these, particularly with the names scratched out, is I wanted to get a sense of the overall strength of the workforce. And I wanted, as I think Mr. Somsen suggested, I wanted to get a sense of what we are in for by way of promotions and bonuses and so forth. Were that to be his answer, would that, do you think, result in Mr. Reardon losing his WPA claim? I believe that would be a factual determination that would be made at a hearing. I'm sorry. The A.J. believed that, credited that. Now, would that mean that he would lose his claim? Yes. If that was believed, I think, then yes. But I think there's one factual— Why does that make his disclosure any different? I mean, don't we assess the disclosure based on what he knew at the time? And if it was a protected disclosure, why does Mr. Jameson's ultimate testimony about  I think I misunderstood. I think, Your Honor, I'm trying to get out a factual point that maybe the panel doesn't know, and that is that this email at 6 o'clock was all preceded by something. And it was all preceded by Captain Reardon going to Mr. Stephan and Mr. Bond and all of them talking about it and them agreeing, yeah, this is wrong. And then that email comes about. So it is that original disclosure to Mr. Stephan by Mr. Reardon. That's the factual point that I was trying to make. But I think you're right. What Mr. Jameson's post-hack rationalization for this is, is sort of beside the point. What really matters is that Reardon raised a concern. He put himself out there as having a concern to his superiors and saying, what you, my superior, are doing is illegal. That's what the WPA protects. So with respect to this issue, what do we get out of a hearing that we don't already have? Well, we get all of this. We get all of these facts out about the timing of things and the concerns, and also we get out We have those already. We have Mr. Reardon's statement that he went to Mr. Stephan, and we have the emails. I'm not sure what, on this issue at least, what a hearing does for us. Well, I'm trying to get over a jurisdictional hurdle that I've been denied to be able to get discovery, to be able to have a hearing, to be able to prove all these claims. Right. But what I'm having trouble with is one of the things you have to prove is that this is a protected disclosure, and it either is or isn't. Is there anything that we don't know now, which we would know at the end of a hearing that would tell us that it is a protected disclosure, even though we concluded now that it wasn't? Maybe the answer is on the yellow piece of paper. Yeah, I think that's the point, that if Reardon is correct, then it's a protected disclosure. And so we don't need to have a hearing on that issue at least? I think that's right. All right. Thank you. The case is submitted.